**Affirmed and Memorandum Opinion filed August 13, 2024**



In The

# Fourteenth Court of Appeals

---

## NO. 14-22-00879-CV

---

## LASONTHIA SANDLES, INDIVIDUALLY AND AS THE PERSONAL REPRESENTATIVE OF THE ESTATE OF CHRISTINE ROLLINS, Appellants

### V.

## DEANNA LOUISE LASKOSKIE, AS ADMINISTRATOR OF THE ESTATES OF GEORGE DELBERT LASKOSKIE, SR., AND LOUISE CLYMER LASKOSKIE, Appellees

---

**On Appeal from the 344th District Court
Chambers County, Texas
Trial Court Cause No. 20-DCV0416**

---

### MEMORANDUM OPINION

Appellant Lasonthia Sandles, individually and as the personal representative of the estate of Christine Rollins, appeals the trial court's final judgment granting no evidence summary judgment that she take nothing on her claims against

appellee Deanna Louise Laskoskie as Administrator of the Estates of George Delbert Laskoskie, Sr. and Louise Clymer Laskoskie.[1]  We affirm.

Rollins was an in-home care giver for George and Louise. She worked daily at the home for about two years.  One day she arrived at George and Louise's home and upon exiting her car she was attacked by an animal or animals.  Rollins suffered a fatal injury during the attack and died.  It is undisputed by the parties that feral hogs fed on Rollins's body and mutilated her legs and much of her body.  There were no witnesses to the attack.  George discovered Rollins's body outside of the home in the general area of the front lawn and the driveway.

Rollins's daughter, Sandles,[2] filed a suit against the property owners, George and Louise alleging strict liability, negligent handling, and premises liability.  In her original petition Sandles alleged that wild feral hogs attacked Rollins, knocked her to the ground and killed her.  After appellee filed a motion for summary judgment arguing that the doctrine of *ferae naturae* barred Sandles's claims, Sandles amended her petition to allege that George and Louise's Labrador, Lucky, and possibly four other smaller dogs, attacked Rollins when she arrived at the house that morning.  Sandles alleged that the dog or dogs knocked Rollins to the ground and, as a result, Rollins was either killed or severely injured.  Sandles then alleged that while Rollins was on the ground that feral hogs fed on her body.  Sandles retained the same causes of action in the amended petition—strict liability, negligent handling, and premises liability.

---

[1] Sandles filed suit against George and Louise. Both died during the pendency of this case.  The administrator of their estates, Deanna Laskoskie, appeared and filed an answer on behalf of the estates.  References to "appellee" will be to Deanna as administrator of the estates of George and Louise.

[2] Sandles filed suit individually and as the personal representative of Rollins's estate.

2

Appellee then filed an amended motion for summary judgment and a no evidence motion for summary judgment. In the no evidence summary judgment motion, appellee attacked every element of Rollins's claims and argued that there was no evidence to support them.

In her response, Sandles attached the sheriff's records of the investigation and the opinion of her expert. The sheriff's records include written reports from officers that were on the scene the day of the attack, written opinions from wildlife specialists opining on the cause of the extensive wounds to Rollins's body, the medical examiner's autopsy report, and photographs from Rollins's autopsy.

Prior to the hearing, appellee filed a "Supplemental Reply" to address issues with Sandles's summary judgment evidence. Regarding the expert report, appellee argued that the report is speculative and conclusory, the expert is not qualified to opine about Rollins's cause of death, Sandles failed to designate the expert timely, and that the expert's opinions are not clear, positive, direct, or reliable. Appellee argued that the expert's methodology for determining that two of the bites were purportedly from the Labrador, Lucky, instead of from a hog was "unscientific" because she based her conclusion on her review of images of Lucky and measuring her own rottweilers' bite widths.

At the hearing on appellee's motion for traditional and no evidence summary judgment, the trial court listened to arguments from counsel regarding the expert report. Ultimately the trial court concluded at the hearing that it "made a reading of [the expert report] and has a question about whether that would even be admissible, and therefore, I guess, I didn't consider [the] expert's testimony in making my ruling, even though you presented it." The trial court rendered a final judgment granting the no evidence motion for summary judgment on all of Rollins's claims.

## EXPERT REPORT

Before considering whether Sandles brought forth sufficient evidence to defeat appellee's summary judgment motions, we must first consider the matter of the expert report. In the trial court appellee filed objections to the expert report and argued that the report should be excluded because it was speculative and conclusory; appellee continues those arguments on appeal. Sandles argued at the hearing that the trial court should consider the report as evidence of causation.

### A.      General Legal Principles

"Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable." *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (citing Tex. R. Evid. 401). Such testimony is "incompetent evidence" and such conclusory testimony cannot support a judgment. *Id*.; *see also Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997) ("[A]n expert witness's conclusory statement . . . will neither establish good faith at the summary judgment stage nor raise a fact issue to defeat summary judgment."). "No-evidence challenges to allegedly conclusory expert testimony require us to examine the record on its face to determine whether the evidence lacks probative value." *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 839 (Tex. 2010). "[C]onclusory statements cannot support a judgment even when no objection was made to the statements at trial." *Coastal Transp. Co., Inc.*, 136 S.W.3d at 232. "An expert's bald assurance of validity is not enough." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997). If there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes within reasonable certainty. *Id.* at 720.

"In short, under well-established case law of this Court, an expert's statement or opinion is conclusory when: (1) he asks the jury to take his word that his opinion is correct but offers no basis for his opinion or the bases offered do not actually support the opinion; or (2) he offers only his word that the bases offered to support his opinion actually exist or support his opinion." *Windrum v. Kareh*, 581 S.W.3d 761, 769 (Tex. 2019).

**B.    Background**

Sandles's expert witness provided an affidavit with her findings stating, "fatal attacks by packs of dogs are not uncommon" but that all the feral swine experts noted that attacks by wild pigs upon humans are "extremely rare." She attested that dog attacks share common elements: (1) they take place on the dogs' property (or nearby); (2) they are outside dogs; (3) they are unsupervised and allowed to roam freely; (4) they work as a predatory unit; (5) there is a prior history of aggression; (6) they will attack even if not hungry or for nutrition. She attested that five-months prior to Rollins's death the large dog, Lucky, attacked "a 375-pound, six-foot man, and for a dog to aggressively approach such a large human speaks to extreme territorial aggression and a complete lack of fear of humans." In reviewing the autopsy photographs, the expert stated there are two wounds that appear to be "dog-like," one located on the shoulder and one on the buttocks. The expert attributed these bite marks to dogs because the wound on the shoulder is approximately 2.86 centimeters and the wound on the buttocks is approximately 3 centimeters, while the others on the body ranged 5 centimeters and larger. Based on Lucky's photograph, the expert believed Lucky's "intercanine width" to be three centimeters and consistent with the two bite marks. The expert opined that the bite on the buttocks is "notable because dogs knock down their prey, and biting at the legs and buttocks is a common tactic." The

5

expert noted that "shredding and removal of clothing, including shoes, is common in fatal dog pack attacks. [Rollins's] clothing and one shoe was removed and torn." Based on her review of the reports and photographs, the expert's hypothesis is that:

> [Rollins] was startled by the pack of dogs coming at her as she walked around her car on her way to the front door of the house, and she dropped her personal items and tried to run. Unfortunately, this action would only serve to add to the dogs' excitement and frenzy in the dawn twilight. As she attempted to get to the front door, she was knocked down by the dogs, by their biting at her legs and/or jumping up on her. Being in a prone position would certainly account for the shoulder bite.
>
> For some unknown reason, the dogs left the body and the feral pigs approached. Swine are known to have an excellent sense of smell, and the combination of a prone animal (food) and the smell of blood (food) would be attractive. I also posit that any wounds on the legs committed by the dog(s) would have been obliterated by the foraging pigs.
>
> . . .
>
> Pack hunting is inherent in domestic dogs. Because dogs do not bite, attack, or molest still objects, it is highly improbable that the dogs would have attacked [Rollins] if she [was] already deceased or after the pigs had been foraging. It is the movement of animals and objects which fuels their prey drive, with the precursor being to attack to force the animal to move. This is normal in carnivores, of which the canine is a member.

The expert further opined that the investigation of the dogs was insufficient.

**C.     Analysis**

The expert report contends that "fatal attacks by packs of dogs are not uncommon. . . . [and] share several common elements" such as (1) the attack will occur on or nearby the dogs' property; (2) the dogs are outside dogs; (3) the dogs are unsupervised and allowed to roam freely; (4) the dogs work as predatory unit;

6

(5) the dogs have a prior history of aggression; (6) the dogs will attack even if not hungry or for nutrition. We agree with appellee that these statements are conclusory. The expert did not provide any basis for these statements and did not cite to any research to support her statement other than from her "bibliography for supporting research studies" — a list of fifteen articles that were not attached to the report. The expert did not summarize the contents of these articles, provide the articles, or cite to any studies supporting her statements. In short, the expert provided a blanket statement of what she alleges is "common" in dog attacks without showing her work. *See Marsillo v. Dunnick*, 683 S.W.3d 387, 394–95 (Tex. 2024) (expert failed to explain how or why he arrived at his conclusions that "[s]nake envenomation is a time-sensitive emergency;' and "the only cure . . . is antivenom," among other assertions, was conclusory and considered no evidence).

Similarly, the expert summarily concludes that the bite on the buttocks is noteworthy because dogs "biting at the legs and buttocks is a common tactic" and "[s]hedding and removal of clothing, including shoes, is common in fatal dog pack attacks." These statements, without more, are also conclusory. The expert does not state what facts she relies on to come to these conclusions, the observations she has personally made in her training and experience with dogs, or what studies she has reviewed or completed to show the frequency with which such behavior occurs in fatal dog pack attacks on persons. *See Marsillo*, 683 S.W.3d at 394–95; *Gammill*, 972 S.W.2d at 727.

The expert identified two wounds that appeared to be "dog-like," one on the shoulder and the other on the buttocks. These bite marks are smaller than the other bite marks measured on Rollins's body, measuring approximately 2.86 and 3.0 centimeters. The other reports also noted these smaller bite markings but concluded they were those of smaller or young wild hogs. The expert's conclusion

that these bite marks are "dog-like" based on their apparent size is conclusory. Setting aside the questionable methodology the expert used to arrive at Lucky's apparent "intercanine width," there is no analysis of the possible differences between these smaller bite marks that are "dog-like" and the other bite markings indisputably made by feral hogs. For instance, the expert states in her summary that feral hog tooth marks often "display a flared pattern" but does not state that such flaring is missing or present in these smaller, "dog-like" markings. Further, the expert has not attempted to rule out alternative causes of these injuries, such as smaller hogs. *Martinez v. City of San Antonio*, 40 S.W.3d 587, 593 (Tex. App.— San Antonio 2001, pet. denied) ("Further, we have held an expert's failure to rule out alternative causes of injury renders the opinion unreliable."). In short, there is no explanation of the expert's conclusion as to why these two bite marks are "dog-like" other than that they appear smaller than the other markings and that dogs will typically bite at the buttocks to take down prey.

Lastly, the expert has offered nothing to suggest that what she believes *could* have happened actually *did* happen. *See Gammill*, 972 S.W.2d at 728. There is no support for the expert's belief that Rollins "was startled by the pack of . . . dogs coming at her . . . and tried to run" and that "she was knocked down by the dogs, by their biting at her legs and/or jumping on her." The opinions here, like those in *Gammill*, are little more than 'subjective belief or unsupported speculation." *See id*. Further, the expert fails to state why the wild hogs could not have just as easily startled Rollins when she exited her vehicle that morning and knocked her down. *See Martinez*, 40 S.W.3d at 593. There is no dispute that wild hogs caused significant damage and mutilation of Rollins's body that morning. "An expert's failure to explain or adequately disprove alternative theories of causation makes his or her own theory speculative and conclusory." *See Merrell*, 313 S.W.3d at 840.

As a result, because of the conclusory nature of the expert report and the failure to adequately explain away other possible causes, we conclude the expert report is conclusory. Even assuming the expert is qualified in dog bite investigations and dog behavior, because her testimony lacks objective, evidence-based support for its conclusions, it is legally insufficient to support the causation element of Sandles's claims. *See id.* (concluding that while expert was qualified, because his testimony lacked objective, evidence-based support for its conclusion, the testimony was legally insufficient to support causation element of plaintiff's claims).

## SUMMARY JUDGMENT

In her first three issues, Sandles argues the trial court erred in granting the appellees' summary judgment motion. Sandles argues the trial court erred in granting summary judgment on her (1) strict liability claim; (2) negligent handling claim; and (3) premises liability claim.

## A.     General Legal Principles

"We review an order granting summary judgment de novo, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference in the nonmovant's favor." *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021). If there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial, then no evidence summary judgment is proper. *Id.* "A properly filed no-evidence motion shifts the burden to the nonmovant to present evidence raising a genuine issue of material fact supporting each element contested in the motion." No evidence summary judgment is improper if the non-movant brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.* "Less than a scintilla of evidence exists when the evidence is so weak as to do no more than

9

create a mere surmise or suspicion of a fact." *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019) (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)).

To recover on a claim of strict liability for injury by a dangerous domesticated animal, a plaintiff must prove the animal's dangerous propensities were a producing cause of the plaintiff's injury. *Bolton v. Fisher*, 528 S.W.3d 770, 777 (Tex. App.—Texarkana 2017, pet. denied) (quoting *Bowman v. Davidson*, No. 06-14-00094-CV, 2015 WL 3988675, at *2 (Tex. App.—Texarkana July 1, 2015, no pet.) (mem. op.)). In a claim of negligent handling of an animal the plaintiff must prove the defendant's breach proximately caused the plaintiff's injury. *Trujillo v. Carrasco*, 318 S.W.3d 455, 459 (Tex. App.—El Paso 2010, no pet.). In a claim of premises liability the plaintiff must prove that the owner or occupier's failure to use reasonable care proximately caused the plaintiff's injury. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000).

"The components of proximate cause are cause in fact and foreseeability." *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). "These elements cannot be established by mere conjecture, guess, or speculation." *Id*. "[T]he producing cause inquiry is conceptually identical of that of cause in fact." *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 223 (Tex. 2010) (recognizing producing cause in DTPA cases, products liability cases, and worker's compensation cases as "conceptually no different from the cause in fact inquiry in negligence cases and the producing cause inquiry in other substantive contexts"); *see also Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995) ("[P]roducing cause is the test in strict liability. Proximate and producing cause differ in that foreseeability is an element of proximate case, but not of producing cause." (citation omitted)). "Cause in fact is established when the act or

10

omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798–99 (Tex. 2004).

**B.    Background**

In her response, aside from her expert report, Sandles attached the sheriff's records of the investigation in Rollins' death, and excerpts from the depositions of Sandles and appellee. The sheriff's records include written reports from officers that were on the scene the day of the attack. One such report from a detective details the scene. Rollins was approximately eighteen feet from the front door of the residence. She was not wearing any pants or shoes and her remaining clothing was "bunched" under her body, exposing her torso. The detective indicated that it appeared her body had been dragged to this spot. There was blood under, near, and around the body. There appeared to be blood stains about fifteen feet from Rollins and approximately twenty-seven feet behind her vehicle. After viewing the wounds on Rollins's body the detective searched the residence and property for any animals. The detective noted that there was "[f]reshly turned earth" toward the front of the property that "appeared similar to signs of hogs." The detective indicated that George reported he had observed a "large pack" of large wild hogs in the area. George also advised that he had dogs on the property consisting of one Labrador and four Corgis. The detective "observed the dogs and they appeared to be well [fed] and were not aggressive towards me or any other law enforcement personnel." George reported that the dogs reside primarily outside the residence and that he fed the dogs twice daily. George reported that when he found Rollins the dogs were "outside standing around [Rollins's] body." The detective reported that when they moved Rollins there were a number of acorns under her body though the nearest acorns on the property to where Rollins was located was

11

approximately 183 feet. The distance between the turned-up earth to Rollins was about 281 feet. The detective was unable to locate any animal tracks on the ground.

The detective spoke with Dr. John Mayer and sent him copies of the scene and autopsy photographs to review. Dr. Mayer opined that the photographs were representative of a "typical wild pig attack on a human." He concluded most of the wounds were consistent with injuries made by adult male wild pigs, while the other wounds are consistent with injuries made by smaller, possibly younger wild pigs. "The concentration of the injuries on the victim's legs is also consistent with a wild pig attack." Dr. Mayer also indicated that it would be unusual for an adult wild male pig to be part of a social unit containing both younger and older wild pigs. He also concluded that the "savagery of this attack is not consistent with most unprovoked attacks under non-hunting circumstances."

The detective also spoke with two other wildlife specialists at Texas A&M University. After reviewing the photographs of the scene and the autopsy the specialists indicated that "[t]he occasion of a human fatality due to feral swine is rare, and this is our first occasion to review such a case." While they noted that fatalities due to feral pigs do occur, typically such attacks occur with injured and cornered pigs and that an "unprovoked attack by a pig is extremely rare." However, they concluded that the evidence observed is consistent with a feral swine attack and feeding patterns. They found no evidence that indicated any other animal was involved stating "[t]here were no observable bite wounds or feeding patterns to indicate that dogs, coyotes or any other species was implicated." They concluded the multiple wounds of varying size was consistent with multiple pigs of varying size and all wounds appeared "consistent with pig dentition." The wildlife specialists indicated that "the extent of the feeding

12

observed would take considerable time and/or feeding by multiple animals, presumably without harassment." Lastly, they opined that the photographs of the dogs did not show "any indications that these dogs were involved in the death or any feeding. There is an absence of blood on the collars or embedded in the fur."

A deputy responding to the attack reported there were five dogs barking from the "moment of [his] arrival on scene, and exhibited territorial aggression towards [him], standing in close proximity to [him] while barking and not backing down or retreating when commanded by the owners or [himself]."

The forensic pathologist's report concluded that Rollins suffered from "multiple bite/penetrating injuries of the torso, head, upper extremities and lower extremities, which are consistent with that of a feral hog(s) assault." The report indicated that the "decedent had markedly pale organs, consistent with exsanguination." The report concluded with the opinion of forensic pathologist that Rollins died from exsanguination, or blood loss, from a feral hog attack.

In her deposition, Sandles testified that her mom had told her that George and Louise had a "big vicious dog" that had previously attacked a person on their property when her mom was working. Typically, George would put the dog up in a room when workers were at the house. Sandles testified that her mom was scared of the dog and she thought it was time to find another job. Sandles attested that her mom said that George was not able to take care of or control the dog.

An incident report dated July 29, 2019, indicated that a "black lab belonging to [George] had bitten a[n] electrical contractor . . . in the left calf. I interviewed [the contractor], he did not want any medical treatment. [George] was to deliver his dog to the local vet for mandatory observation." The veterinarian office records indicate that Lucky was quarantined for rabies observation on July 30.

13

## C.     Analysis

We now turn to whether there is more than a scintilla of evidence, aside from the expert's report, to support the causation elements of Sandles's claims. Sandles argues that she presented more than a scintilla of evidence that Lucky, or the dogs collectively, attacked Cynthia and were the cause of her injuries based on the investigation records of the "dogs' behavior at the scene and [the deputy's] observation of dried blood on the snout of one of the dogs."  In addition to this evidence, there was also evidence that just four months prior to Rollins's death, Lucky bit an electrical contractor while the contractor was working on the property.  Rollins told Sandles that she was scared of Lucky, so much so that she was looking for another job.  Rollins also told Sandles that she thought George was no longer capable of controlling Lucky.  Typically, Lucky was locked up while Rollins was visiting the house.  Lucky was permitted to roam the property without supervision.  One of the reports from the wildlife specialists also indicated that an "unprovoked attack by a pig is extremely rare" and that the "occasion of a human fatality due to feral swine is rare."  George reported that when he found Rollins the dogs were "outside standing around [Rollins's] body."   A deputy responding to the attack reported there were five dogs barking from the "moment of [his] arrival on scene, and exhibited territorial aggression towards [him], standing in close proximity to [him] while barking and not backing down or retreating when commanded by the owners or [himself]."

Taking this evidence as true and indulging every reasonable inference favorable to Sandles, there is not more than a scintilla of evidence supporting the element of causation for any of Sandles's claims. *JLB Builders, L.L.C.*, 622 S.W.3d at 864.  There is abundant evidence that wild hogs caused Rollins's injuries.  There are bite marks and tusk marks all over her body.  Whereas the only

evidence directly tying any of the dogs to the attack is the blood on a small dog's nose and that the dogs were around Rollins's body when George discovered her. When George discovered Rollins's body, she was already deceased. It is not reasonable to infer that a small amount of blood on a dog's nose and the dogs standing around Rollins's body, without more, means that those same dogs caused Rollins's death.

The circumstantial evidence pointed to also does not support a reasonable inference that the dogs were involved in the attack. That Lucky had previously bitten another individual on the property and that George would lock him up whenever there were visitors may support an inference that Lucky has dangerous propensities but does not support an inference that Lucky attacked Rollins on the morning of her death.

Dogs barking at an unknown police officer entering their property is not unusual or even indicative that the dogs were involved in the attack. The fact that an unprovoked attack by a feral hog is extremely rare does not mean such an attack did not occur here, particularly considering all of the evidence of a wild hog attack. That Lucky had previously attacked a contractor on the property and that Rollins was scared of Lucky, thought George did not have control over Lucky, and that she was looking for another job also does not support a reasonable inference that Lucky attacked Rollins on the morning of her death.

Because there is no evidence that the dogs were a cause in fact of Rollins's death, we overrule Sandles' issues on appeal.

## CONCLUSION

Having concluded the trial court properly granted summary judgment on all Sandles's claims, we affirm the judgment of the trial court.


/s/ Ken Wise
Ken Wise
Justice


Panel consists of Justices Wise, Zimmerer, and Poissant.